# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GREG KOWALSKI,      :
 Plaintiff,       :
            :
v.           :  Civil Action No. 3:15-cv-01699 (VLB)
            :
CAROLYN W. COLVIN,     :
COMMISSIONER OF SOCIAL   :  March 3, 2017
SECURITY,        :
 Defendant.       :

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the Plaintiff, Greg Kowalski's, application for disability insurance benefits ("DIB") and supplemental security income benefits (SSI).[1]  It is brought pursuant to 42 U.S.C. §§ 405(g).

Greg Kowalski ("Plaintiff" or "Kowalski") has moved for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"), or remanding the case for rehearing.  [Dkt. No. 13.]  The Commissioner, in turn, has moved for an order affirming the decision.  [Dkt. No. 14.]

---

[1]  Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]."  42 U.S.C. § 405(b)(1).  The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs").  C.F.R. §§ 404.929 *et seq.*  Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council.  20 C.F.R. §§ 404.967 *et seq.*  If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

For the following reasons, Kowalski's Motion for an Order Reversing or Remanding the Commissioner's Decision [Dkt. No. 13] is DENIED, and the Commissioner's Motion to Affirm that Decision [Dkt. No. 14] is GRANTED.

I.   Factual Background

The following facts are taken from the parties' Joint Stipulation of Facts ("Joint Stipulation") [Dkt. No. 17] unless otherwise indicated.

a.   Plaintiff's Background

Kowalski was born on August 20, 1954.  [Dkt. No. 12-3 at 27.]  He completed high school and earned certifications in martial arts from Japan.  *Id.* at 45-47.  He founded, owned, and served as the head instructor for a martial arts studio from 2000 to December 20, 2011, the alleged onset date of his disability.  *Id.* at 20, 47, 49.  He had accrued enough social security earnings to remain insured through September 30, 2013.[2]  *Id.* at 22.

On February 17, 2012, Kowalski applied for a period of disability and disability insurance benefits, and on February 29, 2012, he applied for supplemental security income.  *Id.* at 20.  On September 19, 2012, a disability adjudicator in the Social Security Administration denied his initial request for disability benefits and supplemental security income and thereafter denied his request for reconsideration.  *Id.* at 20.

---

[2]  In order to be entitled to disability benefits, a plaintiff must "have enough social security earnings to be insured for disability, as described in § 404.130." 20 C.F.R. § 404.315(a)(1); *see also Brockway v. Barnhart*, 94 F. App'x 25, 27 (2d Cir. 2004) (noting a claimant's eligibility for Social Security disability insurance benefits terminates on the claimant's date last insured).

2

On May 15, 2014, Kowalski appeared (with counsel) for a hearing before an Administrative Law Judge ("ALJ").  *Id*. at 40.  On September 9, 2014, the ALJ issued a decision denying benefits.  *Id*. at 28.  On September 22, 2015, the appeals council denied Kowalski's request for review of that decision, thereby making the ALJ's decision the final decision of the Commissioner.  *Id*. at 1.   This appeal followed.

   b.  <u>Plaintiff's Medical History</u>

Kowalski's early medical records were not provided to the ALJ, but a July 31, 2012 consultative examination completed for the disability determination process provides an overview of his early medical history.  [Dkt. No. 12-8 at 321.] Kowalski contracted Hepatitis C and cirrhosis of the liver when he was in high school (estimated between 1968 and 1972 based on Kowalski's age), though he was never treated for either condition.  *Id*. at 321.  In "the mid-1990s," he was placed on thyroid medication for hypothyroidism.  *Id*. at 321.  In approximately 2008, he was diagnosed with severe male hypogonadism.  *Id*. at 348.  On October

3

24, 2011,[3] a biopsy and Prostate-Specific Antigen ("PSA")[4] test indicated Kowalski had prostate adenocarcinoma.[5]  *Id.* at 287.  He was formally diagnosed with prostatic adenocarcinoma on December 20, 2011, the alleged date of onset of disability.  [Dkt. No. 12-8 at 283 (primary care physician's medical chart referencing diagnosis on December 21, 2011); *see also* Dkt. No. 12-4 at 79 (referring to diagnosis date).]

On March 13, 2012, Dr. Gary Blick, Kowalski's primary care physician (Dkt. No. 12-4 at 76), indicated there was no evidence Kowalski had recurring malignancy or distant metastases.[6]  [Dkt. No. 12-8 at 282.]  He stated Kowalski's

---

[3] This date is taken from the surgical pathology report recording Kowalski's prostate biopsy and resulting diagnosis.  *Id.* at 287.  In the Stipulation of Facts, the parties cite Dr. Gary Blick's March 13, 2012 medical notes as stating Kowalski was diagnosed with prostate cancer on June 3, 2013 – a date which would postdate Dr. Blick's notes.  [Dkt. No. 17 at 1.]  The confusion appears to arise from Dr. Blick's notes, which list Kowalski's prostate cancer diagnosis as "6/3/3."  *Id.* at 282.  The Court notes this refers not to a date but to the results of the prostate biopsy.  *Gleason Score Definition,* AMERICAN CANCER SOCIETY, available at https://www.cancer.org/treatment/understanding-your-diagnosis/tests/understanding-your-pathology-report/prostate-pathology/prostate-cancer-pathology.html (last visited February 22, 2017) (explaining that prostate exam results can be formatted as 3+3=6 or 6/3/3); *see also* Dkt. No. 12-4 at 79 (Residual Functional Capacity assessment summarizing medical records, noting Dr. Blick reported "Gleason 6/3/3 Prostatic Carcinoma").

[4] Prostate-specific antigen, or PSA, "is a protein produced by cells of the prostate gland.  The PSA test measures the level of PSA in a man's blood. . . . The blood level of PSA is often elevated in men with prostate cancer."  *Prostate-Specific Antigen Test Definition,* NATIONAL CANCER INSTITUTE, available at https://www.cancer.gov/types/prostate/psa-fact-sheet (last visited February 22, 2017).

[5] Adenocarcinoma is "cancer that begins in glandular (secretory) cells," and includes most prostate cancers.  *Adenocarcinoma Definition,* National Cancer Institute, https://www.cancer.gov/publications/dictionaries/cancer-terms?cdrid=46216 (last visited February 22, 2017).

[6] Distant Metastasis "refers to cancer that has spread from the original (primary) tumor to distant organs or distant lymph nodes."  *Distant Metastasis Definition,*

4

other diagnoses as of March 2012 included chronic Hepatitis C, Hypogonadism, impaired focus and concentration, marked fatigue, and memory loss. *Id*. Dr. Blick noted Kowalski experienced depression when he ceased testosterone replacement therapy for hypogonadism for reasons relating to his cancer. *Id*.

On August 13, 2012, Dr. Ralph Stroup, an urologist, examined Kowalski as part of continuing active surveillance of his prostate cancer. *Id*. at 336. Dr. Stroup noted Kowalski's PSA normalized after he stopped testosterone replacement therapy and found his vital signs were stable. *Id*.

On February 21, 2013, Dr. Blick examined Kowalski and found his chronic hepatitis C, still untreated, may be causing Kowalski's reported symptoms including anxiety, arthralgia, confusion, decreased concentration, fatigue, headache, memory loss, and myalgia. *Id*. at 348. He also noted Kowalski's history of severe male hypogonadism and opined the condition was "rapidly worsening" and of "debilitating intensity," causing symptoms including depression, fatigue, impaired focus and concentration, hematuria,[7] insomnia, decreased libido, and lightheadedness. *Id*. Dr. Blick concluded Kowalski was "100% disabled" given his hepatitis C, hypogonadism, and prostate cancer. *Id*. at 351.

---

NATIONAL CANCER INSTITUTE, available at https://www.cancer.gov/publications/dictionaries/cancer-terms?cdrid=415317 (last visited February 22, 2017).
[7] Hematuria is the presence of blood in urine. *Hematuria Definition*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/blood-in-urine/basics/definition/con-20032338 (last visited February 22, 2017).

On April 23, 2013, Dr. Blick again examined Kowalski and noted symptoms including diarrhea lasting longer than one year, abdominal bloating, abdominal cramping, headaches, nausea, heartburn, and loss of approximately fifteen pounds over seven to nine months. *Id.* at 344. Kowalski continued to experience lack of energy and reported difficulty sleeping, depression, anxiety, decreased appetite, decreased ability to concentrate, and negativity. *Id.* Kowalski also reported joint stiffness but no limb pain. *Id.* at 345. He repeated his assessment that Kowalski was "100% disabled" due to hepatitis C, prostate cancer, weight loss, diarrhea, lack of energy, and "prolonged depressive reaction." *Id.* at 347.

On March 10, 2014, Dr. Blick noted continued abdominal pain, abdominal bloating, diarrhea, and heartburn, but no additional unintentional weight loss. *Id.* at 340. He also recorded Kowalski's complaints of continued anxiety, depression, difficulty concentrating, and difficulty sleeping. *Id.* at 341. He again concluded Kowalski was 100% disabled due to chronic hepatitis C and prostate cancer with the aforementioned physical and emotional manifestations. *Id.* at 343.

### c. Expert Examinations and Opinions

On September 6, 2012, Dr. Steven Kahn performed a psychiatric consultative examination and found Kowalski "has had at least a degree of depression as a consequences of [his] physical problems" for "the past four or five years." *Id.* at 324. Dr. Kahn found Kowalski had "low energy and low motivation, which could also be due to his low testosterone and to some of his physical issues" including hypothyroidism. *Id.* Kowalski reported to Dr. Kahn that he is not overly pessimistic or suicidal, has no psychotic symptoms or

**6**

substance abuse problems, but is less inclined to socialize than in the past. *Id*. at 324. Dr. Kahn found Kowalski was cooperative, made good eye contact, had a normal rate of speech, was well-oriented, and could focus and concentrate reasonably well. *Id*. at 324. Dr. Kahn concluded Kowalski "probably [had] adjustment disorder with disturbance of mood." *Id*. at 325. He further noted Kowalski exhibits some symptoms of depression but opined those symptoms, including low energy and low motivation, could be attributable to low testosterone. *Id*. However, Dr. Kahn qualified that conjecture by emphasizing that assessing symptoms of physical ailments is outside his area of expertise. *Id*.

On July 31, 2012, Dr. Micha Abeles performed an internal medicine consultative examination for Connecticut's Disability Determination Services. *Id*. at 321. He reviewed Kowalski's medical history including hepatitis C, cirrhosis of the liver, hypothyroidism, and biopsy suggesting prostate cancer. *Id*. At the time of Dr. Abeles' evaluation, he noted Kowalski's PSA had dropped to within normal limits without surgical intervention. *Id*. Dr. Abeles noted Kowalski could walk, stand, sit for limited periods, use his hands, reach, bend, and lift. *Id*. He evaluated Kowalski and found good range of motion in his joints, normal standing, gait, hand motion, and grip strength. *Id*. at 322.

Dr. Abeles completed a second consultative examination on June 27, 2014. *Id*. at 374. He again reviewed Kowalski's medical history and complaints of symptoms including depression, anxiety, and fatigue. *Id*. In addition, he

documented a past arthroscopy[8] of Kowalski's knees and Kowalski's complaints of "balance issues" and joint and back pain.  *Id.*  Dr. Abeles' examination showed normal range of motion in Kowalski's joints aside from reduced range of motion in his metatarsophalangeal joints[9] compatible with osteoarthritis.  *Id.* at 375.  He also found reasonable motion of Kowalski's back and normal standing, sitting, walking, hand motion, and grip strength.  *Id.*

Dr. Blick completed a Medical Source Statement of Physical Ability to do Work-Related Activities on May 14, 2014.  *Id.* at 326.  He opined Kowalski could never lift or carry any weight, climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, or crawl.  *Id.* at 327, 329.  He added Kowalski could sit for two hours in an eight-hour workday and stand or walk for one hour in an eight-hour workday with the remainder of the day spent sleeping or lying down.  *Id.* at 327.  He noted Kowalski does not require a cane to walk.  *Id.*  He also opined that Kowalski could never reach, handle, finger, feel, push, or pull with either hand, and could occasionally operate foot controls with either foot.  *Id.* at 328.  However, Dr. Blick opined that Kowalski could shop, travel alone, climb a few steps at a reasonable pace, prepare a simple meal, feed himself, and maintain

---

[8] Arthroscopy "is a [surgical] procedure for diagnosing and treating joint problems."  It "allows the surgeon to see inside your joint without making a large incision."  *Arthroscopy Definition*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/arthroscopy/basics/definition/prc-20014669 (last visited February 22, 2017).

[9] Metatarsophalangeal joints connect foot and toe bones.  Metatarsophalangeal Joint Pain Definition, MERCK MANUAL, http://www.merckmanuals.com/professional/musculoskeletal-and-connective-tissue-disorders/foot-and-ankle-disorders/metatarsophalangeal-joint-pain (last visited February 22, 2017).

personal hygiene.  *Id*. at 331.  Dr. Blick based his assessment on Kowalski's hepatitis C, prostate cancer, and hypogonadism, as well as fatigue, chronic diarrhea, impaired ability to focus or concentrate, short-term memory deficit, back pain, and depression.  *Id*.

State agency medical consultant Dr. Lewis Cylus reviewed Kowalski's medical history and notes from an interview with Kowalski to complete a physical Residual Functional Capacity assessment on August 23, 2012.  [Dkt. No. 12-4 at 82.]  Dr. Cylus noted Kowalski has been diagnosed with chronic liver disease and cirrhosis, prostate cancer, a thyroid disorder, and affective disorder.  *Id*. at 80.  He opined Kowalski retains the ability to occasionally lift or carry up to 50 pounds, frequently lift or carry up to 25 pounds, sit, stand or walk 6 hours in an 8-hour workday, and push or pull an unlimited amount.  *Id*. at 82.  Dr. Cylus found no postural, manipulative, visual, communicative, or environmental limitations.  *Id*.

Dr. Susan Uber supplemented Dr. Cylus' report with a psychiatric Residual Functional Capacity assessment on September 10, 2012.  [Dkt. No. 12-4 at 79.]  She opined that Kowalski's affective disorder is non-severe and mildly restricts his activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace.  *Id*.  Dr. Richard also noted Kowalski has experienced "one or two" episodes of decompensation of extended duration.  *Id*.

State agency medical consultant Dr. Angelina Jacobs reviewed Kowalski's medical history and completed a physical Residual Functional Capacity assessment on January 10, 2013.  *Id*. at 104.  She noted Kowalski has been diagnosed with chronic liver disease and cirrhosis, prostate cancer, a thyroid

**9**

disorder, and affective disorder.  *Id.*  She concluded Kowalski did not experience "significant limitations in [his] ability to perform basic work activities."  *Id.* at 107.

Dr. Robert Decarli supplemented Dr. Jacobs' report with a psychiatric Residual Functional Capacity assessment on January 4, 2013.  *Id.* at 105.  Like Dr. Uber, Dr. Decarli concluded that Kowalski's affective disorder caused no more than mild limitations and one or two episodes of decompensation and was overall non-severe.  *Id.* at 105.  To explain his findings, he noted Dr. Kahn's psychological consultative examination revealed Kowalski "related adequately" and retained "a wide range of functional abilities."  *Id.*

### d.  The Claimant's Self-Assessment

On March 30, 2012, Kowalski completed an Activities of Daily Living questionnaire as part of his disability and supplemental security application. [Dkt. No. 12-7 at 239.]  In it, he stated he suffers from pain, stiffness, fatigue, loss of strength, inhibited memory and ability to focus.  *Id.* at 244.  He estimated he can walk two blocks at a time without stopping to rest on a good day.  *Id.* at 245. He stated he can focus up to twenty minutes at a time, does not follow written instructions well, and follows spoken instructions moderately well ("so-so").  *Id.* at 245.  He stated he cooperates well with authority figures and has never been terminated from a job for failure to interact well with others.  *Id.*  He stated he handles stress and changes in routine moderately well ("so-so").  *Id.*  Kowalski also described his daily activities consistently with his hearing testimony, which is discussed below.

e.  <u>The Hearing Before the ALJ</u>

On May 15, 2014, Kowalski appeared (with counsel) for a hearing before an ALJ.  [Dkt. No. 12-3 at 40.]  Kowalski testified that he last worked part-time teaching jujitsu roughly six hours a week, and ceased all work after the onset of his alleged disability.  *Id*. at 48.  Before that time, he was the "owner, founder, and head instructor" of a martial arts studio.  *Id*. at 49.

Kowalski is divorced with no children and lives alone in a rented room in a larger house.  *Id*. at 45.  He wakes up between 8:00am and 11:00am each morning, depending on how well he slept.  *Id*. at 59.  Getting out of bed is "physically [a] very hard struggle" which can take up to an hour.  *Id*. at 59-60.  He showers most days, checks his email, reads, watches movies, and bird watches.  *Id*. at 46, 59.  He cleans his living area by himself and cooks simple meals including instant noodles, oatmeal, and cereal.  *Id*. at 46, 57-58.  For exercise, Kowalski walks around the block.  *Id*. at 57.  Approximately once a week, Kowalski drives to the grocery store and the library.  *Id*. at 57-58.  On good days, while he's running errands Kowalski will visit his former martial arts students.  *Id*. at 58-59.  Kowalski estimates he visits his old students once or twice a months.  *Id*. at 58.

The Plaintiff also discussed his medical history, indicating he has had roughly six doctor's appointments in the last year.  *Id*. at 50.  He has not had chemotherapy to treat his prostate cancer but has instead "self-treated," including taking melatonin and other vitamin supplements.  *Id*. at 50-51.  Kowalski likewise has only taken vitamins and supplements to treat his hepatitis C.  *Id*. at 51.  He stated hepatitis C causes him "chronic fatigue" and headaches, and he

11

also experiences digestive problems and incontinence which he ascribes to "cirrhosis and hep C liver function." *Id*. at 52.  The ALJ asked Kowalski whether there was a diagnosed cause of his joint pain, and he stated it was probably caused by "work . . . a lot of manual labor, [and] some accidents." *Id*. at 55. Kowalski stated doctors have stated his joint pain was caused by "wear and tear" and possible arthritis.  *Id*.  Kowalski takes over-the-counter medication to treat his digestive issues, and has one prescription for digestive medication.  *Id*. at 56.

He stated he has anxiety and depression.  *Id*. at 53.  He is not seeing a therapist but takes Xanax and Lexapro sparingly.  *Id*.  Kowalski understands his depression to be "a side effect of the physical stuff" rather than a "primary issue." *Id*. at 54.  He described his symptoms as exhaustion, headaches and other body aches, sinus problems, and digestive problems, which prevent him from wanting to engage with others socially.  *Id*. at 54.

A Vocational Expert, Christine Spaulding, also testified at the hearing.  *Id*. at 66.  The ALJ first asked Spaulding whether work existed for a person limited to medium unskilled work with additional limitations including inability to climb, crawl, endure extreme heat, wetness, humidity, or excessive vibration, who must avoid machinery, unprotected heights, or driving in a work setting.  *Id*. at 68. Spaulding responded such a person could do cleaning, packing, or salvage labor work.  *Id*.

The ALJ asked if jobs would be available if such an individual were limited to light work, and Spaulding opined the individual could work as a fast food worker, price marker, or cleaner.  *Id*. at 69.

Kowalski's attorney asked Spaulding whether an individual who also could not use his hands could perform any work, and Spaulding responded no.  *Id.* at 70.  Kowalski's attorney also asked whether jobs existed for a person who must sit or stand for only half an hour at a time and walk for one hour at a time, totaling two hours of sitting, one hour of standing, and one hour of walking in a workday. *Id.*  Spaulding responded no jobs would be available to such an individual.  *Id.* at 71.

### f.   The ALJ's Decision

On September 9, 2014, ALJ Eric Eklund issued a decision concluding Kowalski was not disabled within the meaning of the Social Security Act from December 20, 2011 (the date of his prostate cancer diagnosis and alleged disability onset) through the date of the decision.  [Dkt. No. 12-3 at 21.]

ALJ Eklund determined Kowalski's hepatitis C was a severe impairment. *Id.* at 23.  In addition, ALJ Eklund recognized that Kowalski has prostate cancer, but noted Kowalski has undergone no formal treatment and there is no evidence in the record suggesting prostate cancer has caused him any limitations or symptoms.  *Id.* at 23.  ALJ Eklund also considered Kowalski's hypogonadism, which Kowalski claims has caused fatigue, lethargy, and poor focus since he stopped testosterone therapy due to his cancer diagnosis.  *Id.*  However, ALJ Eklund found "little evidence to support more than minimal functional limitations" relating to hypogonadism.  ALJ Eklund also found "little evidence at all regarding the claimant's alleged hypoactive thyroid disease," and no evidence showing it caused more than minimal functional limitations.  *Id.*  The ALJ also

13

found insufficient evidence of limitations caused by Kowalski's joint pain, noting that while Kowalski occasionally complained of joint stiffness, no objective findings, imaging reports, or diagnostic testing has confirmed any joint-related impairments. *Id.*

As to psychological impairments, ALJ Eklund found Kowalski's depression and anxiety caused "no more than mild restriction" in activities of daily living, social functioning, concentration, persistence, or pace. *Id.* at 24. He also found no evidence of episodes of decompensation in the record. *Id.* ALJ Eklund explained that while Kowalski complained to Dr. Blick and Dr. Kahn regarding low energy, low motivation, and poor concentration, those complaints alone are insufficient to establish a severe impairment. *Id.* ALJ Eklund emphasized that Dr. Kahn's psychological examination showed Kowalski's "mental status . . . was largely normal," and that Kowalski's depressive symptoms appeared to stem from physical issues and financial stress. *Id.* at 24. ALJ Eklund gave Dr. Kahn's consultative evaluation some weight, and gave great weight to the State agency psychological opinions finding Kowalski's mental impairments non-severe. *Id.*

The ALJ also concluded Kowalski had no impairment or combination of impairments that met or equaled one of the listed impairments in the social security regulations. *Id.* at 25. ALJ Eklund especially considered whether Kowalski's hepatitis C met or equaled the requirements of listing 5.05, which describes chronic liver disease.[10] *Id.* However, because Kowalski had no

---

[10] Listing 5.05 requires: "A. Hemorrhaging from esophageal, gastric, or ectopic varices or from portal hypertensive gastropathy, demonstrated by endoscopy, x-

14

"varices with hemorrhaging, ascites or hydrothorax, spontaneous bacterial peritonitis, hepatorenal syndrome, or hepatic disease," he did not meet or equal listing 5.05's requirements.  *Id.*

Having found no listed impairments, ALJ Eklund next evaluated Kowalski's residual functional capacity ("RFC") and found he was capable of the full range of medium work.  *Id.* at 25.  ALJ Eklund noted Kowalski claimed hepatitis C, prostate cancer, joint pain, depression, and anxiety, with symptoms including low energy, fatigue, headaches, incontinence, and digestive problems.  *Id.* at 25.  The ALJ determined Kowalski's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but found Kowalski's "statements concerning the intensity, persistence, and limiting effects" of those symptoms "not entirely credible."  *Id.* at 26.  ALJ Eklund explained the medical evidence includes "remarkably little evidence . . . regarding the claimant's alleged impairment."  *Id.*  ALJ Eklund noted that "at worst," the record indicates Kowalski experiences "occasional abdominal discomfort and bloating, increased urinary urgency, diarrhea, and fatigue."  *Id.*

---

ray, or other appropriate medically acceptable imaging, resulting in hemodynamic instability as defined in 5.00D5, and requiring hospitalization for transfusion of at least 2 units of blood. Consider under disability for 1 year following the last documented transfusion; thereafter, evaluate the residual impairment(s). OR
B. Ascites or hydrothorax not attributable to other causes, despite continuing treatment as prescribed, present on at least 2 evaluations at least 60 days apart within a consecutive 6-month period. Each evaluation must be documented by:
1. Paracentesis or thoracentesis; or
2. Appropriate medically acceptable imaging or physical examination and one of the following:
a. Serum albumin of 3.0 g/dL or less; or
b. International Normalized Ratio (INR) of at least 1.5."

ALJ Eklund assigned great weight to Dr. Abeles' two consultative examinations noting two "largely normal" examinations consistent with the medical record which showed "little to no evidence of any notable difficulties." *Id*. at 26.  The ALJ also considered Dr. Blick's opinion as Kowalski's treating physician, including his assertion that Kowalski "could not perform any work-related activities or be productive in any meaningful way," and his routine indication in treatment notes that Kowalski is "100% disabled."  *Id*. at 26-27. However, ALJ Eklund found "virtually no objective findings or signs on record that would support anywhere near the degree of limitation described by Dr. Blick."  *Id*. at 27.  He accordingly assigned no weight to Dr. Blick's opinion.  *Id*.

ALJ Eklund also gave great weight to State agency medical consultant Dr. Cyclus's opinion that Kowalski could perform medium work as consistent with the record.  *Id*.  Conversely, he ascribed little weight to State agency medical consultant Dr. Jacobs' opinion that hepatitis C was a non-severe impairment, noting that while that condition does not rise to the level of disability, it does "warrant a limitation" in Kowalski's exertional level.  *Id*.

After considering Kowalski's medical history, self-assessment, and physician opinions regarding his limitations, ALJ Eklund concluded Kowalski retained the ability to perform medium exertional work.  *Id*.  Based on Kowalski's RFC, age, education, and work experience, ALJ Eklund determined jobs exist in the national economy Kowalski could perform, although he did not list those jobs specifically in his decision.  *Id*. at 28.

II.   Standard of Law

The Social Security Act establishes that benefits are payable to individuals who have a disability.  42 U.S.C. § 423(a)(1).  "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."  42 U.S.C. § 423(d)(1).  In order to determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[11]

A person is disabled under the Act when their impairment is "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  *Id*.[12]

_____

oul[11]  The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4)(i)—(v).

[12]  The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the Court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting

---

which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." *Id.*

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence must be

"more than a scintilla or touch of proof here and there in the record."  *Williams*,

859 F.2d at 258.

  III.    **Discussion**

        Kowalski challenges four aspects of ALJ Eklund's decision: (A) his finding

that Kowalski's prostate cancer and hypogonadism were non-severe

impairments; (B) the weight he ascribed to Kowalski's treating physician and

non-treating sources; (C) the RFC analysis, which Kowalski asserts failed to

account for his fatigue, labored breathing, memory loss, and pain; and (D) the

vocational analysis, which Kowalski asserts did not incorporate testimony from a

Vocational Expert.  [Dkt. No. 13.]  The Court discusses Kowalski's objections in

turn below.

            a.  <u>Whether the ALJ correctly identified all severe impairments</u>

        Kowalski asserts his prostate cancer is a severe impairment because his

PSA levels in February 2014 were higher than they were in May 2012, and

because "watchful waiting is a legitimate and common treatment strategy for

prostate cancer."  [Dkt. No. 13 at 8-9.]  He asserts his hypogonadism is a severe

impairment because Dr. Blick noted that Kowalski experienced symptoms of

hypogonadism including impaired focus and concentration, memory loss,

dizziness, and headaches.  *Id.* at 9.

        The Commissioner responds that Kowalski's prostate cancer diagnosis by

itself does not qualify as a severe impairment.  [Dkt. No. 14 at 11 (citing *Rivers v.*

*Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) ("A 'mere diagnosis' . . . without a

finding as to the severity of symptoms and limitations does not mandate a finding

19

of disability.").)]  The Commissioner also asserts Kowalski's symptoms related to hypogonadism are documented only through his own complaints to Dr. Blick rather than through objective medical findings.  *Id.*  Lastly, the Commissioner notes that even if ALJ Eklund erred in failing to find prostate cancer or hypogonadism a severe impairment, the fact that he found Kowalski to have at least one severe impairment (his hepatitis C) means any error at step two is harmless.  *Id.* (citing *O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014)).

A claimant seeking social security benefits bears the burden of showing that he or she has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  "The severity regulation requires the claimant to show that he has an impairment or combination of impairments which significantly limits the abilities and aptitudes necessary to do most jobs." *Id.* at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).  It is the plaintiff's burden to provide "medical evidence which demonstrates the severity of her condition."  *Merancy v. Astrue,* No. 3:10-cv-1982(WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012).

Further, the omission of one or more severe impairments at step two is "harmless where the ALJ also later considers the effects from the omitted impairment as part of the ultimate RFC determination."  *Matta v. Colvin*, 13-cv-5290, 2016 WL 524652, at *12 (S.D.N.Y. Feb. 8, 2016) (quoting *Melendez v. Colvin*, 1:13-cv-1068, 2015 WL 5512809, at *5 (N.D.N.Y. Sept, 16, 2015)); *see also Texidor v. Astrue*, 3:10-cv-701, 2014 WL 4411637, at *3 (D. Conn. Sept. 8, 2014) ("[I]t would be harmless error at step two for an ALJ to fail to find an impairment severe as

long as the ALJ determines that at least one of the claimant's impairments are severe, and then continues with the remaining steps of the analysis.").

In this case, ALJ Eklund considered Kowalski's prostate cancer but found no record evidence suggesting that Kowalski experiences "any limitations or symptoms related to this condition."  [Dkt. No. 7-3 at 23.]  Kowalski does not raise any evidence of limitations caused by his prostate cancer in his motion to reverse the Commissioner's decision, and the Court has found none.  As the Commissioner notes in its motion to affirm, a "mere diagnosis," without evidence that the diagnosed condition has "resulted in severe physical limitations on [the claimant's] ability to work," is insufficient to establish that an impairment is severe.  *Rivers*, 280 F. App'x at 22 (finding diabetes and fibromyalgia non-severe conditions because there was no record evidence the diagnosed conditions caused severe impairments).  ALJ Eklund's conclusion that Kowalski's prostate cancer did not cause limitations rendering it a severe impairment is supported by substantial evidence.

Likewise, ALJ Eklund considered Kowalski's hypogonadism and complaints of related fatigue, lethargy, and poor focus, but found "little evidence to support more than minimal functional limitations."  [Dkt. No. 7-3 at 23.]  The ALJ had discretion to weigh Kowalski's complaints "in light of the other evidence of record" to determine whether they rise to the level of disability.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  ALJ Eklund's conclusion that Kowalski's fatigue, lethargy, and poor focus caused no more than minimal functional limitations is supported by substantial record evidence, including Kowalski's own

testimony that he completes all of his own household chores and runs errands weekly, as well as multiple consulting physicians' "normal physical examinations with virtually no findings or signs consistent with any notable physical impairments."  [Dkt. No. 7-3 at 23.]  Kowalski has offered no evidence of limitations the ALJ failed to consider, and the Court has found none.  ALJ Eklund's finding that Kowalski's hypogonadism does not constitute a severe impairment is supported by substantial evidence.

Further, even if ALJ Eklund had erred in finding Kowalski's prostate cancer and hypogonadism non-severe, he identified one severe impairment (hepatitis C) and continued with the disability analysis, rendering any error harmless.  *Texidor*, 2014 WL 4411637 at *3.

The Court concludes Kowalski failed to show that his prostate cancer and hypogonadism were "severe" and, even if they were severe, it was harmless error not to identify them as such.  Kowalski's motion to reverse on this ground is DENIED and the Commissioner's motion to affirm is GRANTED.

b.  <u>Whether the ALJ appropriately weighed the medical opinions in the record</u>

Kowalski next asserts ALJ Eklund was required to assign Dr. Blick's opinion "significant, if not controlling weight" because Dr. Blick is Kowalski's treating physician and because he is an "expert in infectious diseases."  [Dkt. No. 13 at 11-12.]  Conversely, Kowalski argues the ALJ should not have assigned great weight to non-treating and non-examining State agency physicians Dr. Cylus and Dr. Uber.  *Id.* at 12.  He reasons Doctors Cylus and Uber only reviewed

**22**

a portion of Kowalski's medical records and do not have the expertise that Dr. Blick has as an infectious disease expert. *Id.*

The Commissioner replies that ALJ Eklund appropriately ascribed weight to physicians' opinions based on whether their opinions were supported by the medical record. [Dkt. No. 14 at 13.] The Commissioner also notes that ALJs are entitled to rely on the opinions of State agency medical consultants as "highly qualified experts in the field of social security disability." *Id.* (citing *Frey ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record.")). Further, the Commissioner disputes Kowalski's characterization of Dr. Blick as an expert in infectious diseases, but rather asserts Dr. Blick "does not hold a board certification in infectious disease or even internal medicine." *Id.* at 14.

A treating physician generally garners greater weight under the social security regulations because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. 404-1527(c)(2).

Given the unique nature of a treating physician's opinion, such an opinion is generally "given 'controlling weight' as long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

23

inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2*)); see also Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (holding that "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" where those other opinions amount to "substantial evidence to undermine the opinion of the treating physician").  Where a treating physician's opinion conflicts with other record evidence, it is "within the province of the ALJ" to determine which portions of the report to credit, and to what extent.  *Pavia v. Colvin*, No. 6:14-cv-06379 (MAT), 2015 WL 4644537, at 4 (W.D.N.Y. Aug. 4, 2015) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

In determining the amount of weight to give a treating physician's opinion, the social security regulations provide certain considerations:  "Generally, the longer a treating source had treated [a claimant] and the more times [the claimant] has been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion."  20 C.F.R. 404-1527(c)(2)(i).  In addition, "the more knowledge a treating source has about [the claimant's] impairment(s), the more weight [the ALJ] will give the source's medical opinion."  20 C.F.R. 404-1527(c)(2)(ii).  In determining a treating physician's level of knowledge, the ALJ looks at "the treatment the source has provided and . . . the kinds and extent of examinations and testing the source has performed."  *Id.*  Further, "[t]he more a medical source presents relevant evidence to support an opinion, particularly

medical signs and laboratory findings, the more weight [the ALJ] will give that opinion." 20 C.F.R. 404-1527(c)(3).

In addition, "state agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." *Tyson v. Astrue*, 3:09-cv-1736, 2010 WL 4365577, at *10 (D. Conn. June 15, 2010), *report and recommendation adopted*, 2010 WL 4340672 (D. Conn. Oct. 22, 2010) (citing 20 C.F.R. § 404.1527(f)(2)(I)).  "As the Second Circuit has held, the opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record." *Id.* (citing *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir. 1993)).

In this case, ALJ Eklund considered Dr. Blick's opinion that Kowalski is "100% disabled" and capable of no work-related or other meaningfully productive activities, but found "virtually no objective findings or signs on record that would support anywhere near the degree of limitation described by Dr. Blick."  [Dkt. No. 7-3 at 27.]  By contrast, ALJ Eklund found State agency medical consultant Dr. Cylus' opinion that Kowalski could perform medium exertion work supported by the medical record, as well as consultative examining physician Dr. Abeles' 2012 and 2014 examinations showing "largely normal" findings.  *Id.* at 26-27.

ALJ Eklund was entitled, and in fact required, to weigh each medical opinion by whether record evidence supported it.  20 C.F.R. 404-1527(c)(3).  While Dr. Blick was Kowalski's primary care physician through the relevant period, his conclusion that Kowalski has extreme limitations is "inconsistent with the other substantial evidence in [the] case record" and accordingly does not warrant great

weight.  *Burgess*, 537 F.3d at 128.  Kowalski's assertion that Dr. Blick's testimony is due great weight simply because Dr. Blick is his treating physician, without regard to its contradiction with the medical record, is incorrect.  *Mariani*, 567 F. App'x at 10.  Conversely, ALJ Eklund was not constrained to discount State agency medical consultant Dr. Cylus' opinion simply because he was not the treating physician.  ALJ Eklund appropriately granted Dr. Cylus' opinion great weight given its consistency with the medical record and the expertise of state agency medical consultants.   *Tyson*, 2010 WL 4365577 at *10.

The Court concludes that the ALJ appropriately weighed treating and non-treating medical sources in his decision in the RFC analysis and throughout his decision.  Kowalski's motion to reverse on these grounds is DENIED and the Commissioner's motion to affirm is GRANTED.

### c. Whether the ALJ appropriately considered Kowalski's conditions in his RFC analysis

Kowalski asserts the ALJ failed to appropriately consider Kowalski's fatigue, labored breathing, memory loss, and pain in the RFC analysis.  [Dkt. No. 13 at 14-15.]  He argues his hearing testimony asserting it is difficult for him to get out of bed establishes that his fatigue and labored breathing limit his ability to function.  *Id.* at 15.  He also argues his hearing testimony that "returning phone calls or reading emails causes him stress" and "everything seems like a big challenge" establish that his memory loss, impaired focus and impaired concentration limit his ability to function.  *Id.*  Finally, he asserts his hearing testimony that he sometimes wears joint braces or walks with a cane, in addition to medical notes discussing his joint stiffness and pain, should have led ALJ

26

Eklund to assign Kowalski a lower RFC.  *Id.* at 15-16.  The Commissioner does not respond to Kowalski's challenge to the RFC analysis.  [Dkt. No. 14.]

Residual functional capacity is "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.[13] A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.  RFC is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).[14]

An ALJ must consider, but need not accept Kowalski's self-assessments. Where a claimant has given a self-assessment of his or her limitations, The ALJ must first determine if the claimant's asserted symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a).  If so, the ALJ assesses the claimant's credibility with respect to the alleged symptoms.  "[A] claimant's subjective

---

[13] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).
[14]  An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining his/her RFC. 20 C.F.R. § 416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

27

evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." *Skillman v. Astrue*, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010) (citing *Simmons v. U.S.R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)); *Barringer v. Comm'r of Soc. Sec.,* 358 F. Supp. 2d 67 (N.D.N.Y. 2005) (applying two step analysis described in 20 C.F.R. §§ 4:04.1529 to evaluate claimant's asserted symptoms).  However, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

In this case, ALJ Eklund considered Kowalski's complaints in determining his RFC.  [Dkt. No. 7-3 at 25.]  He explicitly considered Kowalski's low energy, fatigue, and pain in his RFC discussion.  *Id.*  While he did not mention Kowalski's reports of labored breathing and memory loss, he stated he considered Kowalski's hearing testimony in general.  An ALJ need not robotically cite each and every factor he or she considered and specifically list every piece of evidence considered in rendering his conclusion.  *Id.*; *Brault v. Social Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012).  Citing *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir.1998), the Second Circuit adopted the notion that "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Brault* at 448.  Here the record indicates that the ALJ did consider all the evidence.  In addition to the specific things ALJ Eklund mentioned having considered, the ALJ stated he considered Kowalski's testimony during which the claimant brought forth his fatigue, labored breathing, memory loss, and pain.

**28**

Thus, the record indicates that the ALJ did not fail to consider these symptoms in conducting his RFC analysis.

ALJ Eklund's conclusion was not based on the lack of evidence, but rather on the lack of credible evidence of the severity of the claimant's ailments.  The ALJ has the authority and indeed the duty to assess the claimant's credibility in light of the medical findings and other evidence in the record. See *Mimms v. Heckler*, 750 F.2d 180, 185–86 (2d Cir.1984); Social Security Ruling 96–7p, 1996 WL 374186 (S.S.A.). Where, as here, the ALJ's credibility analysis and factual findings are based on the application of the appropriate law, the Court may not examine the evidence and substitute its own judgment. 42 U.S.C. § 405(g); *Parker v. Harris*, 626 F.2d 225 (2d Cir.1980).  The ALJ is in the best position to make a credibility assessment because he has the benefit of observing the claimant's demeanor while testifying. The ALJ found Kowalski's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." [Dkt. No. 7-3 at 26.]  However, The ALJ reviewed the medical record and found "little evidence to suggest that the claimant has experienced any notable functional limitations" beyond "[a]t worst . . . some complaints of occasional abdominal discomfort and bloating, increased urinary urgency, diarrhea and fatigue."  *Id*.  In addition, as discussed above in part B of this decision, ALJ Eklund determined the medical opinions in the record reflected normal physical examinations and an ability to perform medium exertional work.  *Id*. at 26-27.  ALJ Eklund assessed Kowalski's credibility and found the claimant's "statements concerning the intensity, persistence and limiting effects of [those] symptoms

**29**

[were] not entirely credible," considering the totality of the record.  [Dkt. No. 7-3 at 26.]

Kowalski has raised no medical evidence the ALJ failed to consider in evaluating his reported symptoms and determining his RFC.  Nor does he contend that the ALJ misapplied the law.  This court has no basis to question the ALJ's credibility analysis. ALJ Eklund's RFC determination is supported by substantial record evidence.  Accordingly, Kowalski's motion to reverse on this ground is DENIED; the Commissioner's motion to affirm is GRANTED.

### d.  Whether the ALJ failed to secure testimony from a Vocational Expert

Lastly, Kowalski argues ALJ Eklund failed to secure vocational expert testimony when determining that jobs exist in the national and local economy which Kowalski could perform, and accordingly failed to meet his burden of proof at the last step of the disability analysis.  [Dkt. No. 13 at 16-17.]

The Commissioner responds that ALJ Eklund did elicit testimony from a Vocational Expert at the disability hearing, and even if he had not, an ALJ may rely on the Medical-Vocational Guidelines at the last step of the disability analysis if the claimant's nonexertional limitations do not significantly diminish the range of work he or she can perform.  [Dkt. No. 14 at 17 (citing *Selian v. Astrue*, 708 F.3d 409, 422 (2d Cir. 2013).]  Here, the Commissioner notes Kowalski's RFC included no nonexertional limitations, but rather encompassed the full range of medium work.  *Id.*

The ALJ is correct.  "At Step Five [of the disability analysis], the Commissioner must determine that significant numbers of jobs exist in the

national economy that the claimant can perform.  An ALJ may make this determination either by applying the Medical Vocational Guidelines ["Grids"][15] or by adducing testimony of a vocational expert*."  McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. § 404.1520(a)(4)(v)).  ALJs must apply the Grids on a case-by-case basis, and if the Grids accurately reflect a claimant's limitations, then an ALJ may solely use them in assessing the availability of jobs that the claimant can perform.  *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"Vocational expert testimony is required only if a claimant's 'nonexertional limitations . . . significantly limit the range of work permitted by his exertional limitations.'" *Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (quoting *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)).  A significantly limiting nonexertional impairment must "so narrow a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  *Zabala*, 595 F.3d at 4111.

The Commissioner argues that the ALJ was not required to secure vocational testimony because Mr. Kowalski's RFC did not include non-exertional limitations.  In response, Kowalski argues that the ALJ's RFC analysis was lacking because it failed to consider Kowalski's testimony concerning fatigue and labored breathing.  As noted above, the ALJ did consider the entire record including Kowalski's testimony, but found the claimant's testimony of the severity of his symptoms incredulous.

---

[15]  *See* 20 C.F.R. pt. 404, subpt. P.

Further, "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,'" *McIntyre,* 758 F.3d at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983)) and the hypothetical "accurately reflect[s] the limitations and capabilities of the claimant involved."  *Id.*  "A vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." *Id.* at 152.  As stated above in part C of this decision, the ALJ "does not have to state on the record every reason justifying a decision."  *Brault,* 683 F.3d at 448.  "'Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted.'"  *Id.* (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  In addition, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Id.*

In this case, ALJ Eklund elicited testimony from Vocational Expert Christine Spaulding.  [Dkt. No. 3-7 at 66.]  As she stated at the hearing, Ms. Spaulding has been a vocational rehabilitation counselor for over 26 years and has provided vocational expert testimony for the Social Security Administration for over 21 years.  *Id.*  ALJ Eklund asked her whether jobs were available to a person "limited to medium work," with certain non-exertional limitations based on the RFC opinions in the medical record.  *Id.* at 68.  She opined that at least three jobs were available in the national and local economy for such a person.  *Id.* at 68-70.  Kowalski's attorney did not object to her testimony.  *Id.*

ALJ Eklund's conclusion that jobs exist in the national and local economy which someone capable of the full range of medium work could perform reflects Vocational Expert Spaulding's testimony.  [Dkt. No. 3-7 at 28.]  ALJ Eklund did not cite Spaulding's testimony specifically in his decision; nor was he required to do so.  *Brault,* 683 F.3d at 448.

The Court concludes that the ALJ's decision that Kowalski can perform jobs that exist in significant numbers in the national and local economy is supported by substantial evidence of record, including Vocational Expert testimony.  Kowalski's motion to reverse on this ground is DENIED and the Commissioner's motion to affirm is GRANTED.

IV.  **Conclusion**

For the reasons set forth above, Kowalski's Motion for an Order Reversing or Remanding the Commissioner's Decision [Dkt. No. 13] is DENIED and the Commissioner's Motion to Affirm that Decision [Dkt. No. 14] is GRANTED.

It is so ordered this 3rd day of March 2017, at Hartford, Connecticut.

_____/s/_____

Vanessa L. Bryant, U.S.D.J.

33